UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
OXFORD DIVISION

RONNIE DINOLFO                                                                      PLAINTIFF

VS.                                                        CAUSE NO. 3:17-CV-00013-MPM-JMV

HOME DEPOT U.S.A., INC.                                                            DEFENDANT

# ORDER

This cause comes before the court on the motion of defendant Home Depot U.S.A., Inc. for summary judgment, pursuant to Fed. R. Civ. P. 56. Plaintiff Ronnie Dinolfo has responded in opposition to the motion, and the court, having considered the memoranda and submissions of the parties, concludes that the motion is not well taken and should be denied.

This is a Title VII and Americans With Disabilities Act ("ADA") retaliation case arising out of plaintiff's February 11, 2016 termination as an assistant manager at Home Depot's Horn Lake department store. Plaintiff first began working for Home Depot as a sales associate in 1997, and the parties disagree regarding how effective an employee he was. Plaintiff insists that he was a good employee, and he buttresses this statement with testimony from his store manager that he was one of the best assistant mangers he ever had. Defendant notes, however, that plaintiff had received a number of negative performance evaluations throughout his time at the company, culminating with his receiving a final warning and then being terminated after he had a dispute with a subordinate. However, plaintiff's termination came only five months after he had threatened to file a charge of discrimination with the EEOC, based on allegedly discriminatory remarks made by Norma Kinkead, the manager at the Olive Branch store where plaintiff worked until shortly before his termination. Plaintiff alleges that he confronted Kinkead about her

1

remarks, thereby incurring her animosity, which he alleges led to Home Depot's initial refusal (later countermanded) to pay him an expected mid-year bonus in 2015.

Shortly thereafter, plaintiff threatened to file an EEOC complaint, and in September 2015, Home Depot transferred plaintiff to its Horn Lake store, ostensibly to separate him from Kinkead and to give him a "fresh start." [Defendant's brief at 11]. However, plaintiff contends that the decision to fire him had already been made even before the transfer, and he alleges that the performance-based reasons cited in support of his eventual termination were merely a pretext for unlawful retaliation. For its part, Home Depot contends that plaintiff had two serious performance lapses at the Horn Lake store, including by failing to properly secure the store at closing time and for disciplining an employee under his supervision in an unfair and disrespectful manner. Defendant has presently moved for summary judgment, arguing that no genuine issue of fact exists regarding its liability and that it is entitled to judgment as a matter of law.

## **ANALYSIS**

In alleging unlawful retaliation, plaintiff argues that he was fired 1) for opposing remarks by Kinkead which expressed discriminatory animus contrary to Title VII and the ADA and 2) for threatening to file an EEOC complaint arising out of these remarks and the allegedly related decision to initially deny him a bonus. Title VII prohibits discrimination against an employee on the ground that "he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The ADA similarly provides that "[n]o person shall discriminate against any individual because such

individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203. The Fifth Circuit "applies the same analysis to ADA and Title VII retaliation claims," as well as to 42 U.S.C. § 1981 claims. *Stringer v. Mound Bayou Public School District,* 2016 WL 183701, *13 (N.D. Miss. Jan. 14, 2016), *citing Grubic v. City of Waco*, 262 Fed. Appx. 665, 666 n.6 (5th Cir. 2008).

To prevail on his retaliation claim, Plaintiff must first establish a prima facie case. "In order to make a prima facie case, a plaintiff must show '(1) he participated in an activity protected by Title VII [or the ADA]; (2) his employer took an adverse employment action against him; and (3) a causal connection exists between the protected activity and the adverse employment action." *Stringer*, *13, *citing McCoy v. City of Shreveport*, 492 F.3d 551, 557; *see also Brandon v. Sage Corp.,* 808 F.3d 266, 270 (5th Cir. 2015). If the plaintiff makes a prima facie case, the burden then shifts to the employer to proffer a legitimate rationale for the underlying employment action. *Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 484 (5th Cir. 2008). If such a reason is provided, the plaintiff then bears the burden of proving that the employer's reason is a pretext for the actual retaliatory reason. *Id.* The plaintiff at all times retains the ultimate burden to prove that intentional retaliation was the "but for" cause of the adverse employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533, 186 L.Ed.2d 503 (2013) (Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened motivating factor causation test); *Seamn v. CSPH, Inc.*, 179 F.3d 297 (5th Cir. 1999) ("But-for" standard also applies in ADA retaliation cases.)

3

In the court's view, the summary judgment inquiry in this case is a quite straightforward one. This is because this court has only a single retaliation claim by plaintiff to consider, and, even as to that claim, defendant has conceded important elements of it. That is, defendant acknowledges that plaintiff has established fact issues regarding whether he engaged in activity which is protected under Title VII and/or the ADA, but it maintains that no such fact issues exist regarding whether it terminated plaintiff in retaliation for engaging in that activity. Specifically, defendant writes in its brief that:

> For purposes of this Motion for Summary Judgment only, Home Depot concedes that Plaintiff engaged in protected activity under Title VII and/or the ADA. However, Plaintiff cannot show a causal connection between his alleged protected activity and his termination from Home Depot. The first instance of the alleged protected activity at issue in this case took place in July of 2015, when Plaintiff met with Mr. Turner and Mr. Cogdell and complained that Ms. Kinkead said an employee was too fat to be working at Home Depot and that Ms. Kinkead called another Home Depot employee an alcoholic. In September of 2015, while the AACG was investigating Plaintiff's previous July of 2015 complaint, Plaintiff complained to the AACG that Ms. Kinkead made a racial statement regarding a white employee. Also in September of 2015, Plaintiff complained regarding his annual evaluation and that he would not be receiving a bonus because of his annual evaluation. Plaintiff further alleged that he threatened to file an EEOC charge for Home Depot's "unethical behavior" and for withholding his bonus because of his annual evaluation. Plaintiff did not relate his threat to go to the EEOC to any protected characteristic or any protected activity, only to Home Depot's "unethical behavior."

[Defendant's brief at 18-19].

Having conceded that fact issues exist regarding whether plaintiff engaged in protected activity,[1] defendant is left to argue that no genuine issues of material fact exist regarding whether his firing was the result of his having engaged in that activity. In arguing this point, defendant writes in its brief that:

---

[1] In its brief, defendant makes it clear that, while it is conceding this issue for purposes of its summary judgment motion, it intends to dispute at trial whether plaintiff engaged in protected activity. [Id. at 19, footnote 3]. While it is certainly defendant's right to do so, this court is presently concerned only with the summary judgment motion, and it will accordingly explore this issue no further in this order.

> Simply put, Plaintiff has no evidence of a causal connection between his protected activity and his termination. Plaintiff may allege that the temporal proximity between his protected activity and his termination is enough to establish a prima facie case of retaliation. However, even if Plaintiff's vague threat to file a charge with the EEOC is considered protected activity under the law, this occurred in September of 2015. Home Depot terminated Plaintiff on February 11, 2016. The United States Supreme Court has held that "cases that accept mere temporal proximity… as sufficient evidence of causality to establish a prima facie case uniformly hold that temporal proximity must be "very close."" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 121 S.Ct. 1508 (2001). The temporal proximity between Plaintiff's latest, putative protected activity and his termination was around five months. The Fifth Circuit has found that a five-month lapse, by itself, does not support an inference of a causal link. *Stroud v. BMC Software, Inc.*, 2008 WL 2325639 (5th Cir. June 6, 2008).

[Defendant's brief at 19-20].

Defendant thus argues that there is an insufficiently close temporal proximity between plaintiff having engaged in protective activity and his subsequent firing. In the court's view, defendant's argument considerably understates both the closeness of plaintiff's temporal proximity evidence and also his quite strong proof that the reasons given for firing him were pretextual. In so stating, this court would first observe that, in the context of a nineteen-year career working for Home Depot, a five-month proximity between plaintiff's protected activity and his firing seems rather close. Nevertheless, even assuming that such a period is insufficient as a matter of law under Fifth Circuit precedent, the fact remains that plaintiff has potentially strong evidence that Home Depot had already reached a decision to fire him even before February 11, 2016. Considered in this light, this court believes that plaintiff's temporal proximity proof is much closer than five months.

Some of Dinolfo's strongest proof in this context is the deposition testimony of Drew Gentry, who was the manager of the Horn Lake store where plaintiff worked when he was fired. Gentry figures prominently in defendant's own description of the final decision to terminate plaintiff, characterizing him as the individual who accepted the investigators' recommendation to

5

fire him, in consultation with district manager Joel Cogdell and senior human resources managers. [Defendant's brief at 15]. It is thus quite significant that Dinolfo is able to present very strong proof that not only did Gentry consider plaintiff to be an exemplary employee, but that he was aware of a strong impetus from upper management to fire him even before he arrived at the store.

In his deposition, Gentry testified that, when plaintiff was transferred to the Horn Lake Home Depot, he was told by Kinkead that Home Depot district manager Cogdell had told her "that she needed to fire Ron or he was going to fire her." [Gentry depo. at 11]. Both of these alleged statements appear to constitute non-hearsay admissions by a party opponent.[2] In the court's view, this testimony casts doubt upon defendant's suggestion that plaintiff was being transferred to Horn Lake simply to separate him from Kinkead and that he was being given a "fresh start" at the store. Rather, Gentry's testimony suggests that plaintiff's job was already in severe jeopardy at the time he was transferred to the Horn Lake store, which clearly serves to strengthen his temporal proximity argument. This conclusion is strengthened by Gentry's testimony that Cogdell told him to "tone down" evaluations he wrote about plaintiff which were deemed overly effusive in praising his work:

> A. Yes, sir. Yeah, I let Ron know what a good job he was doing in emails and texts. I think I had some good notes in his file also. Ron did a very good job for me as an assistant manager.
> Q. Isn't it true that Joel told you to tone that down?
> A. Yes, sir.
> Q. And did he tell you why he wanted you to tone it down?

---

[2] This court notes that the Federal Rules of Evidence deem statements "offered against an opposing party and … made by the party's agent or employee on a matter within the scope of that relationship and while it existed" to be admissions by a party opponent. Fed. R. Evid. Rule 801(d)(2)(D). It thus appears to this court that this alleged statement, and the others quoted below, are not hearsay. This court further notes that many of the statements in question do not appear to be introduced for the truth of the matter asserted, but rather for other purposes, such as to show the state of mind of the speaker.

> A. He did not, no, sir.
> Q. What did you understand -- why did you understand him to want you to tone it down?
> A. What do I think, like my opinion?
> Q. I mean, when he asked you to tone it down, why did you think he wanted you to tone it down?
> A. I don't know. I'm not Joel.

[Gentry depo. at 25-26].

Gentry testified that, once plaintiff arrived at the store, he "did a phenomenal job" and that he was "one of the best ASMs I've ever had." [Id. at 11]. Plaintiff's evidence in this context is significantly buttressed by the quite consistent deposition testimony from two former Home Depot employees, who testified regarding words allegedly spoken by Gentry to them. Specifically, former Home Depot employee Adam Ammar testified that:

> Q. And did Drew Gentry ever indicate he had any problems with Mr. Dinolfo's work performance?
> A. No. He loved Ron, his work performance.
> Q. Did he ever indicate to you that he was forced to get rid of -- forced to fire Ronnie Dinolfo?
> A. Yes. His exact words: "It's either him or me."
> Q. He told you that if he didn't fire Ron Dinolfo he would be fired?
> A. He would be fired.
> Q. When did he tell you that, in relation to Mr. Dinolfo's termination?
> A. Right before or right after, one of the two.

[Ammar Depo. at 19]. Stephen Dagenheart, another former Home Depot employee, similarly testified that:

> Q. Have you ever had any conversations with Mr. Gentry about Ronnie Dinolfo and Norma wanting to get rid of him?
> A. I haven't had conversations with him about Norma wanting to get rid of him. I have had a conversation with him about how well Ron was doing underneath him.
> Q. And tell me what he -- best you recall, what he told you.
> A. Pretty much that Ron was an all-star. That he came over to the Horn Lake and was knocking it out of the park; making a sales plan; made his store look nice and clean; didn't have any problems with him.
> Q. Did he ever voice any criticism of Mr. Dinolfo's work?
> A. None.
> Q. Did he ever indicate to you that he was under pressure to terminate Mr. Dinolfo?
> A. Word -- I guess it would be word of mouth.

7

> Q. Just tell me what -- we'll let the judge decide what's hearsay and –
> A. Yeah, I mean. Exactly.
> Q. Just tell me what you know.
> A. Right. He never came out straight-up and said that he had to get rid of Ron.
> Q. Did he say words that you interpreted somewhat that that might be the case?
> A. That he was the still under the gun because Ron was being transferred over to, basically, get rid of -- he was basically given the task to get rid of a problem, to separate him and Norma, and they wanted Ron gone.
> Q. Did Drew tell you that they wanted Ron gone?
> A. Not exact, word for word. That was the interruption [sic] that I got. You asked for an interruption. [sic].
> Q. Exactly. Which is good. I appreciate that. But what -- can you give me the words that you interpreted that, as best you recall.
> A. That he was going to fight for Ron, because Ron was doing such a good job, and that he still felt a lot of pressure that whatever Ron was doing was just not good enough to satisfy Mr. Cogdell -- Joel.

[Dagenheart depo at 12].

Considered together, the above testimony from Gentry, Ammar and Dagenheart constitutes some of the strongest evidence of pretext which this court has seen in an employment discrimination case, and it frankly does not need to see any additional proof in order to conclude that plaintiff has met his burden at the summary judgment stage. Indeed, this court has rarely, if ever, seen a case where the manager described by the defendant as the final decision-maker (in consultation with others) regarding termination is as effusive in his praise of plaintiff's work performance as Gentry is in this case. Defendant may have a hard time explaining this discrepancy at trial. Additionally, this court regards as highly significant Gentry's testimony that Cogdell told him to "tone down" his praise of plaintiff, since it can discern no good reason why a district manager would not want his store managers to make candid and accurate evaluations of their employees' performance, good or bad. The fact that Cogdell evidently sought to place his thumb on the scale of plaintiff's evaluations raises serious questions as to what his genuine motivations were. This court's concerns in this regard are strengthened by Dagenheart's

testimony that Gentry "still felt a lot of pressure that whatever Ron was doing was just not good enough to satisfy Mr. Cogdell – Joel." [Id.]

In so stating, this court acknowledges that Gentry denied telling Ammar and Dagenheart some of the things that they quoted him as saying, but he himself confirmed the essentials of their testimony in his own deposition. While this court thus regards plaintiff's evidence of pretext as being very strong, it acknowledges that Home Depot has extensive evidence that he had received a large numbers of negative performance evaluations throughout his lengthy tenure at the company. In its brief, defendant provides extensive discussion of these negative evaluations, which started in 2007 and continued until plaintiff's termination.[3] However, plaintiff insists that Home Depot managers were required to put such negative evaluations in employees' files and that he himself had been told to do so in his evaluation of subordinates. [Plaintiff's brief at 4]. Plaintiff's assertion in this regard certainly appears to be supported by Gentry's testimony regarding Cogdell's instructions to him to "tone down" his praise of plaintiff's performance.

Clearly, it is for a jury to consider the above evidence and decide how good an employee plaintiff was, but, at this stage, this court is required to view the facts in the light most favorable to him, as the non-moving party. For better or worse, defendant regarded plaintiff as a

---

[3] This court notes that the incident which defendant describes as the final straw supporting plaintiff's firing was, arguably, rather weak as a basis for termination, and it clearly involves disputed fact issues. Specifically, defendant contends that it took exception to plaintiff's decision, while holding a meeting of store employees, to ask a subordinate named Lavakous Whirl to leave. [Defendant's brief at 17]. Plaintiff insists that he only did so after Whirl stated that "he didn't care" about what he had to say. Defendant characterizes this alleged statement by Whirl as "rank hearsay," but it is clearly not being introduced to prove the truth of the matter asserted and, that aside, appears to be an admission by a party opponent. Defendant also disputes that Whirl even made such a remark, but it is for a jury to determine the truth in this regard and also to decide whether this incident actually motivated plaintiff's termination.

9

sufficiently good employee to keep him on the payroll for nineteeen years, and his store manager at the time he was fired clearly thought he was an exceptionally good employee. Moreover, there is considerable evidence, discussed previously, that wheels were set in motion to have plaintiff fired almost immediately after he threatened to file an EEOC charge against the company. Under these circumstances, it is for a jury to determine whether the decision to fire plaintiff was the result of genuine performance deficiencies on his part, or whether these were merely pretextual.

In so stating, this court acknowledges that, even if jurors conclude that the reasons for firing plaintiff were pretextual, that does not necessarily mean that they would deem them a pretext for unlawful retaliation. Indeed, there is very considerable evidence in the record that there was a strong personal dislike between plaintiff and Kinkead, and, if a jury finds that simple personality clashes were the reason for plaintiff's termination, then that would not, of course, support a judgment in his favor on his retaliation claim. Moreover, even if the jury does find in favor of plaintiff on his retaliation claim, defendant notes that there are real questions regarding whether he made adequate efforts to secure new employment after he was fired and thus mitigate his damages. Even assuming that defendant's arguments in this context are found persuasive by a jury, however, they would simply go to the issue of damages and do not constitute the basis for a dismissal on summary judgment. At this juncture, this court simply concludes that genuine fact issues exist regarding plaintiff's retaliation claim, and defendant's motion for summary judgment will therefore be denied.

It is therefore ordered that defendant's motion for summary judgment is denied.

So ordered, this the 28th day of March, 2018.

                                              <u>/s/ Michael P. Mills</u>
                                              U.S. DISTRICT COURT
                                              NORTHERN DISTRICT OF MISSISSIPPI